UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| DONNA COFFELT, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 5:14-cv-56 |
| v. ) | |
| ) | REPORT AND RECOMMENDATION |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner, ) | By: Joel C. Hoppe |
| Social Security Administration, ) | United States Magistrate Judge |
| Defendant. ) | |

Plaintiff Donna Coffelt asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 6. Having considered the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's decision that Coffelt is not disabled.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work *See* 20 C.F.R. § 404.1520(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four.

*Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Coffelt filed for DIB on November 9, 2011. Administrative Record ("R.") 69, ECF No. 13. She was 56 years old at the time, *id.*, and had last worked as a nurse, R. 219. Coffelt alleged disability beginning November 30, 2013, because of neck, back, and leg pain, high blood pressure, sleep apnea, attention deficit hyperactive disorder, and vascular disease in her legs. R. 69. A state agency denied her claim initially and on reconsideration. R. 69–80, 82–94. Coffelt appeared with an attorney at an administrative hearing on January 9, 2014. R. 36–68. She testified to her medical conditions and the limitations those conditions caused in her daily activities. R. 43–57. A vocational expert ("VE") also testified about Coffelt's work experience and her ability to return to her past work or to perform other work in the national and local economies. R. 58–66.

The ALJ denied Coffelt's application in a written decision dated February 12, 2014. R. 19–29. He identified Coffelt's date last insured as June 30, 2006. R. 19. He found that through her date last insured, Coffelt had severe impairments of failed lumbar laminectomy syndrome, lumbar degenerative disc disease with radiculopathy, knee osteoarthrosis, obesity, and chronic pain. R. 21–23. He determined that these impairments, alone or in combination, did not meet or equal a listing. R. 23. The ALJ next determined that Coffelt had the residual functional capacity ("RFC")[1] to perform light work[2] with some postural and environmental restrictions. R. 23–27.

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can

Relying on the VE's testimony, the ALJ concluded that Coffelt could not have returned to her previous work, but could have performed other jobs available in the economy, such as garment sorter, fruit cutter, and fabric folder. R. 27–28. He therefore determined that Coffelt was not disabled under the Act through her date last insured. R. 28. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

### III. Relevant Medical Evidence

Coffelt fell at her workplace in March 1999 and injured her lower back. R. 490–91. She had a lumbar laminectomy in April 1999, R. 497–98, and an additional laminectomy with lumbar fusions in April 2000, R. 468–70. Over the following three years, her back condition was treated with medication, nerve blocks, and an epidural neurolysis. R. 305–26.

Coffelt's alleged onset date is November 30, 2003. R. 44–45. A week earlier, on November 24, 2003, she saw John Zoller, M.D., for a follow-up visit. R. 302–03. She reported leg spasms at night, on her right side more than her left, and some trouble sleeping. Her current medications helped her chronic pain symptoms, and nerve blocks had been effective. On physical examination, she had tender and spastic gluteal muscles, bilateral tenderness of her L5-S1 facet joints, and unimpaired spinal range of motion. Dr. Zoller administered a paravertebral nerve block at L5-S1, and Coffelt stated that she wanted to go forward with radiofrequency neurolysis[3] which they had discussed previously. *Id.*

---

perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

[3] Radiofrequency neurolysis, or radiofrequency neuronotomy, "is a procedure to reduce back and neck pain [wherein h]eat generated by radio waves is used to target specific nerves and temporarily interfere with their ability to transmit pain signals." Mayo Clinic, *Radiofrequency Neuronotomy: Definition*, Nov. 26, 2014, http://www.mayoclinic.org/tests-procedures/radiofrequency-neurotomy/basics/definition/prc-20013452.

4

On December 15, 2003, Coffelt received radiofrequency neurolysis of her right L2-L3 through L5-S1 dorsal rami. R. 301, 339–41. Fifteen days later, she reported that "her low back pain ha[d] decreased greatly" since the procedure. R. 300. She had tender and spastic gluteal muscles bilaterally with no distinct trigger points and minimal bilateral trochanteric tenderness. Her spinal range of motion remained unimpaired and comfortable. *Id.* On March 3, 2004, Coffelt reported that nerve blocks remained effective and the neurolysis had helped to the point that she had some days with minimal to no pain. R. 298–99. In the previous two weeks however, she had cramping in her right leg and left lower back pain radiating into her buttocks. On physical examination, she had no sensory deficits through her lumbar and gluteal areas, some tenderness in her posterior superior iliac spine, minimal tenderness in her lumbar facets, and comfortable spinal range of motion. Dr. Zoller administered a bilateral superior clunial nerve block. *Id.*

Coffelt returned to Dr. Zoller on April 21, complaining of lower back and left leg pain with some numbness and tingling in her left leg. R. 296–97. On examination, she had tenderness over her soleus on the left and difficulty with plantar flexion, but no sensory deficits or pain on a straight leg raise test, and comfortable, unimpaired spinal range of motion. *Id.* Tests performed then and two days later found no evidence of a blood clot or deep vein thrombosis. R. 432, 825–26.

On June 4, 2004, Coffelt saw Sherry A. Whisenant, M.D., and reported that she had run out of medication and was experiencing severe back pain radiating to her right hip. R. 1146. Dr. Whisenant wrote that Coffelt appeared acutely ill and was too uncomfortable to examine. She refilled Coffelt's medication and helped her schedule a nerve block for the following week. *Id.* Coffelt returned to Dr. Zoller for the nerve block on June 14, 2004. R. 294–95. She complained of increased lower back and right shoulder pain. Her sensation and muscle strength were

5

unchanged, but she had tenderness bilaterally at L5-S1, and her spinal range of motion was impaired and uncomfortable. Dr. Zoller indicated that Coffelt would be scheduled for a pain pump trial. *Id.*

One month later, Coffelt reported decreased pain, though her spinal range of motion remained uncomfortable. R. 293. Another month after that, on August 16, 2004, Coffelt reported increased back, bilateral hip, and right leg pain. R. 291–92. She had tenderness bilaterally at her L5-S1 facets and uncomfortable spinal range of motion. Dr. Zoller administered a nerve block. *Id.*

On September 23, 2004, Coffelt received a morphine injection to test the possible effectiveness of a surgically implanted pain pump. R. 293, 337–38. The following month, Coffelt reported lower back pain, but told Dr. Zoller that she was very pleased with the injection and wanted to go forward with the pain pump. R. 289. She was unchanged on physical examination and her spinal range of motion again appeared uncomfortable. *Id.*

On November 5, 2004, Coffelt had an intrathecal pump surgically implanted without complications. R. 288, 334–36. When her sutures were removed ten days later, she reported no post-procedure pain and her spinal range of motion was comfortable and unimpaired. R. 286. Coffelt reported through a phone call on December 16, 2004, that her hip pain was better, though she still had pain in her knees when climbing stairs. R. 285. In a February 7, 2005, phone call, Coffelt stated that she was "getting along very well" with the pain pump and used some ibuprofen if the pain increased. R. 284. On April 22, 2005, Dr. Zoller refilled Coffelt's pump and administered nerve blocks. R. 282–83. She reported that her low back pain was "overall doing well," though she had some bilateral hip pain that day. She was tender over both L5-S1 facets, and her spinal range of motion was minimally uncomfortable. *Id.* When Coffelt returned for

6

another refill on August 31, 2005, she stated that her lower back pain was managed by the pump and oral medications and that she was functional. R. 280–81. Her spinal range of motion was minimally uncomfortable, and she displayed mild cervical kyphosis. *Id.*

Coffelt returned to Dr. Zoller for refills of her pain pump roughly every four months through the end of 2006. R. 272–79. At each visit, she reported that she was functional and the chronic pain in her lower back, hips, and legs was managed with the pain pump and oral medications. *See* R. 272, 274, 276, 278. Her examination findings remained relatively consistent throughout, though her lumbar range of motion was minimally uncomfortable on December 21, 2005, uncomfortable on April 12, 2006, comfortable on August 2, 2006, and uncomfortable with flexion and retroflexion on November 21, 2006. *Id.* Coffelt also reported other intermittent issues, including intermittent pain in her hands, shoulder, and neck, sleeping issues, and knee pain, for which she received an injection on August 2, 2006.

## IV. Discussion

On appeal, Coffelt argues that the ALJ incorrectly determined her RFC by failing to consider or incorporate opinions from her treating physicians. Specifically, she alleges that the ALJ overlooked a questionnaire from Dr. Whisenant and inadequately explained his analysis of a questionnaire from Dr. Zoller. Pl. Br. 4–12, ECF No. 18.

A.   *Legal Standard*

"Medical opinions" are statements from "acceptable medical sources," such as physicians, that reflect judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. § 404.1527(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and

7

state-agency medical consultants. *See* 20 C.F.R. § 404.1527(c). A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir.2001); 20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, then he must weigh the opinion in light of certain factors including the source's medical specialty and familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *Burch v. Apfel,* 9 F. App'x 255, 259 (4th Cir.2001) (per curiam); 20 C.F.R. § 404.1527(c)(2). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. § 404.1527(c), 404.1527(e)(2).

The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin,* 734 F.3d 288, 295–96 (4th Cir.2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. § 404.1527(c)(2); *see also Mastro,* 270 F.3d at 178 (the ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence" only if he gives "specific and legitimate reasons" for doing so). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96–8p, at *5).

Medical opinions are distinct from medical-source opinions on issues reserved to the Commissioner, such as whether the claimant is disabled. 20 C.F.R. §§ 404.1527(d)(1), 404.1545(a). The ALJ must consider these administrative findings by medical sources as he would any relevant evidence, but he need not accord "any special significance" to the source's

8

medical qualifications. *Id.* § 404.1527(d)(3); *see also Morgan v. Barnhart,* 142 F. App'x 716, 722 (4th Cir.2005) ("The ALJ is not free . . . simply to ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which [the conclusions are] supported by the record.'" (quoting SSR 96–5p, at *3)).

B.   *Medical Opinions*

On May 10, 2012, Dr. Whisenant completed a Multiple Impairment Questionnaire and accompanying letter. R. 1599–1606, 1977. For clinical findings in support of her opinion, Dr. Whisenant referenced a March 2012 MRI and a June 14, 2011, functional capacity evaluation performed by physical therapist Ward Morrow. *See* R. 1599–1600, 1609–18. That evaluation found reduced range of motion in Coffelt's spine, hips, shoulders, and knees; some decreased strength in her lower extremities; a severe right lateral shift in her posture and gait; and difficulties with all postural movements except sitting. Morrow concluded that "[t]he client agrees that she can perform sedentary work in sitting with infrequent lifting of not more than 8 pounds from waist high and carry 25 feet," though all other lifting and any other postural movements should be avoided. R. 1618. Dr. Whisenant stated that Coffelt had extreme fatigue and constant pain in her lumbar back, hips, and legs. R. 1600–01. She opined that Coffelt could not work in a competitive environment or handle even low stress environments, and she noted that Coffelt had not worked since 2006, when she had been unable to work even two hours a day. R. 1604. She stated that the earliest date these symptoms and limitations applied was 1999. In her accompanying letter, Dr. Whisenant wrote that she concurred with the physical therapy department's conclusion that physical therapy "is incapable of returning [Coffelt] to work of any kind" and that her disabilities were "permanent and not solvable by any medications, treatment options or further surgery." R. 1977.

9

On August 15, 2012, Dr. Zoller completed a Multiple Impairment Questionnaire and accompanying letter. R. 1955–56, 1960–67. He found that Coffelt could sit and stand or walk for 1 hour in an 8-hour workday; could occasionally lift or carry 0–5 pounds, but never more than that; would need to take a 10-minute unscheduled break every 1–2 hours; and could not push, pull, kneel, bend, or stoop. He opined that Coffelt's pain would frequently interfere with her attention and concentration, she could tolerate low stress, and she would have more than three "bad days" a month. He stated that the earliest date these symptoms and limitations applied was June 29, 2011. R. 1966. In his accompanying letter, Dr. Zoller summarized her treatment history, noting that the pain pump had successfully reduced Coffelt's pain, though it was ultimately removed because of infection following a battery replacement procedure. R. 1955. He concluded that additional surgery may help, but that Coffelt was totally disabled at the time of his writing. R. 1955–56.

C.   *Analysis*

The ALJ addressed Coffelt's doctors' opinions in one short paragraph. Concerning Dr. Whisenant, he stated that "[n]o weight is given Exhibit 29F because it is not consistent with the claimant's actual level of functioning or treatment records." R. 27. For Dr. Zoller, he found that "Exhibit 25F is consistent with the claimant['s] residual functional capacity. Dr. Zoller has indicated that the claimant is not disabled from all work-related activity." *Id.* In both instances, the ALJ cited to the doctors' letters, which reference the questionnaires they completed, but did not directly cite to the questionnaires themselves. He also did not provide any further description of what the letters or questionnaires contain. To the extent that this analysis fails to meet the standard, that failure is harmless.

10

An ALJ's failure to explain his findings is harmless "as long as the record provides an adequate explanation of the Commissioner's decision." *Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) (brackets omitted). In this case, Dr. Whisenant's letter and questionnaire are based upon examinations performed years after Coffelt's date last insured and are completely at odds with the medical record from the relevant period. Dr. Zoller's questionnaire states that it does not refer to Coffelt's condition before 2011, and his letter, which notes that the pain pump "successfully reduced [Coffelt's] pain," R. 1955, actually supports the ALJ's conclusion. It is inconceivable that these opinions could have altered the ALJ's conclusion if given greater consideration. S*ee Kersey v. Astrue*, 614 F. Supp. 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

The relevant time period for this application is November 30, 2003, through June 30, 2006. Dr. Whisenant's opinion is based upon evaluations of Coffelt in 2011 and 2012, five years or more after her date last insured. Though she opines that the significant limitations within her opinion existed as early as 1999, the record does not support that level of debility for any twelve-month period during the relevant time. From November 10, 2003, through November 5, 2004, Coffelt was treated with oral pain medication, nerve blocks, radiofrequency neurolysis, and a morphine injection. *See* R. 289–304. These methods were variably successful. Coffelt consistently stated that nerve blocks were effective and reported greatly decreased pain after the neurolysis and the morphine injection. Throughout that time, she exhibited tenderness in her back and legs, occasional spasm in her gluteal region, and occasional discomfort with spinal range of motion. Her most significant pain occurred when she ran out of medication, R. 1146,

11

but she reported less pain once she had resumed regular medication and received a nerve block, R. 293–94.

From November 5, 2004, through the end of the relevant period in 2006, Coffelt was additionally treated with a surgically-implanted pain pump. *See* R. 272–88, 334. She reported significant improvement in her back and leg pain from the pump. R. 284 (stating she was "getting along very well" with the pain pump and ibuprofen), R. 282 (reporting that her low back pain was "overall doing well"). Though she experienced other intermittent issues with her neck, shoulders, knees, and insomnia, she repeatedly stated that her chronic back pain was managed by the pump, nerve blocks, and medication and that she was functional on this regime. *See* R. 272, 274, 276, 278, 280.

The medical records document that during the relevant period, especially once she had the pain pump, Coffelt's chronic back impairment was well-managed and she considered herself functional. When a symptom, such as pain, "can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). The ALJ discussed these records and findings in his written opinion. *See* R. 21–22. Dr. Whisenant's conclusion that the severe impairments she found in 2011 and 2012 relate back to the relevant period is flatly contradicted by the record and does not deserve credit. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (substantial evidence supported ALJ's decision to reject treating physician's conclusory opinion where the opinion was not supported by the physician's own treatment notes and was inconsistent with other evidence in the record); *Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009) (noting that the ALJ may assign little or no weight to a treating-source opinion "if he sufficiently explains his rationale and if the record supports his findings"). The ALJ's reasons for disregarding Dr. Whisenant's letter, though terse, were

12

accurate, and additional consideration of her Multiple Impairment Questionnaire could not have swayed his analysis under this record.

Considering Dr. Zoller's opinions, the doctor expressly stated that the limitations in his Multiple Impairment Questionnaire applied only to Coffelt's condition after June 2011. The ALJ had no obligation to consider an opinion on Coffelt's impairments five years after the relevant period. Further, Dr. Zoller's letter opines that she was significantly limited at the time of his writing in 2012, but relates that the pain pump successfully reduced Coffelt's pain until it had to be removed. In that sense, Dr. Zoller's summary of Coffelt's treatment supports the ALJ's conclusion. As with Dr. Whisenant, analysis of these opinions in greater detail could not have led the ALJ to a different administrative decision.

## V. Conclusion

The Court must affirm the Commissioner's final decision that Coffelt is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, I recommend that the Court **DENY** Coffelt's motion for summary judgment, ECF No. 17, **GRANT** the Commissioner's motion for summary judgment, ECF No. 20, and **DISMISS** this case from the docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation,] any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 6, 2016

*Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge